Good morning, Judge Vea, Judge Tashima, Judge Aikuda. My name is Eric Johnson. I'm appearing for Petitioner-Specific Northwest Generating Cooperative, Public Power Council, Northwest Requirements Utilities in the City of Canby, Oregon. This is an administrative proceeding on review before the Court. The Court's review is under Northwest Power Act Section 9E and the Administrative Procedure Act. Under these statutes, the Court reviews the final actions of the agencies. The final action in this case is the execution of a contract with Alcoa by BPA. The final action is not BPA's equitable benefits test. The EBT is simply a framework for BPA's explanation of its actions. In itself, the EBT is a straw man, not a final action, not a rate. The Court should not render an advisory opinion on the EBT. For those persons who are not as familiar with acronyms as you are, Mr. Johnson, why don't you tell us what you mean by EBT? The equitable benefits test, the EBT, is Bonneville's label for its explanation of how its actions are justified in this case. One question I had was whether we even get into EBT, because it seems to me, and correct me if I'm wrong, that the Act itself, at Section 839E, small c, Arabic 1, capital B, Arabic 2, requires that the direct industrial user, such as Alcoa, be quoted a price which is called the IP price, which is the preference rate plus the retail markup of public and cooperative utilities, so that I don't see how, since the FP, or preference rate, is supposed to be a cost-covering rate, and the IP rate is the FP rate plus the retail markup, I don't see how BPA can charge a rate which results in a $300 million loss over the period of the Alcoa contract. It does, Your Honor, because the agency does not, in fact, have the inventory of firm power to serve Alcoa's loads. Now, by firm power, that's another term. By that you mean power generated by Columbia River Federal Resources? Firm power is power that is guaranteed to be available 24-7, 365 days a year, regardless of weather conditions under almost all circumstances imaginable. You would have to have worse than critical water. That is nearly the worst runoff in the Pacific Northwest for the hydroelectric system not to be able to deliver firm power and for BPA not to perform its contracts. Well, in fact, aren't there contingency plans to import power to meet the firm power needs? Yes, but Bonneville must purchase that power at market rates. Our contention is that Bonneville does not any longer have a surplus of firm power that it can serve Alcoa with without purchasing in the marketplace. They don't disagree with that, do they? I mean, they have some contingencies where they say, yes, it could be a $300 million loss, but they get offsetting benefits. The offsetting benefits are illusory, Your Honor. Before you go to that, can I just ask you where we are in the timing of the contract? The initial period under the contract is set to end May 26, 2011, and so has that been changed or is that initial period actually ending in a couple of weeks? The initial period is ending in a couple of weeks, but Bonneville has agreed to extend the initial period for another year. And is that before us or are we just looking at the contract as written? We are looking at the entire contract as written. Separate petitions for review on the decision to extend the contract were not filed. Will then be filed. And so your initial arguments in the brief is that the initial period is also inconsistent with their statute or with sound business principles, but don't we know at this point whether they made their $10,000 profit or whether they actually went into the hole? We don't, Your Honor. Why is that? Well, they don't tell us. Bonneville doesn't account for these things and report. In fact, in the comments that were submitted to the agency during the proceeding which preceded its decision, there were requests by customers for BPA to take an accounting and report, and BPA declined to do that. I'm sorry. Go ahead. But isn't this controversy now primarily about the second phase contract? No, Your Honor. It's about the entire contract. So the facts about the first phase are already in existence, whether you know them or not. So your arguments about what would happen and whether they made a good deal or not are sort of a questionable area because the facts have already played out. On the second part of the contract, there's language in BPA's brief saying, well, we think PNGC-2 actually gave us the authority to trigger the second period. In that case, the transition period, which would have started March 2, 2010, would now be over. So are we still in the transition period or is the transition period over or are they now do you know where we are on the timeline? The transition period has not started yet, Your Honor. They've extended the initial period. They did not make a decision for a time on whether the transition period will take place. But this is what we're talking about. So why is that even before us? I mean, they haven't made any decision. They're not taking the position that it was abrogated by PNGC-2? Your Honor, they misread PNGC-2. The PNGC-2 court said that a below-market sale to a direct-service industrial customer is highly suspect. Bonneville must present rational justifications for that sale. Mr. Johnson, I didn't get an answer to my question, and your last comment underlines and emphasizes that. You're talking about a below-market sale to a direct industrial customer. As I read the statute, BPA does not have the discretion to make a below-market sale to an industrial user. It must charge the IP rate. The PNGC-2 decision, Your Honor, answered that question. The IP rate, as Bonneville sets it, is in these times well below market, and it has been for a number of years. But doesn't it have to cover their costs? Isn't that the language in the statute? Your Honor, Bonneville relies on surplus sales to cover a portion of its cost. If it sells power to Alcoa, it's incurring an opportunity cost that it would have to sell into the market at higher prices and cover a larger portion of its costs. Your answers sound typical of a class in law and economics, and I appreciate that. But my question is this. Are we or are we not bound by the section number which I stated to you a moment ago? Your Honor. Go ahead. I'm sorry. I didn't mean to talk over your side. Which it is, as I understand it, that Bonneville Power Authority must charge the IP rate to Alcoa. Not may charge it, but must charge it. Now, am I wrong about that? No, Your Honor, you're not wrong about that. This case is not about the rate that Bonneville charges to Alcoa. This case is about Bonneville's decision to sell power to Alcoa. In PNGC2, the court said that a decision to sell power to Alcoa below market, but at the industrial power rate made in accordance with Bonneville's statutes, is not a safe harbor. If this is a money, it's not a safe harbor. So you don't dispute that the contract calls for the sale of power to Alcoa at the statutory rate. Your dispute is that they should not have exercised their discretion to make that sale at all because of the loss that it would entail. That's correct, Your Honor. Bonneville's rate is not before the court at this time. It's the decision whether to sell power on the agreed terms and conditions. Your position is that the insertion by Congress of the term sound business principles requires Bonneville Power Administration to follow the maximum that we've all learned in business one, which is a firm should maximize profits and minimize losses. Is that right? Almost. My client's position is that Bonneville is supposed to sell power to its preference customers at cost. Bonneville may sell power to the direct service industrial customers at a price that does not result in a loss. If it results in a loss, taking into account the fact that Bonneville may not have an inventory and may have to go buy it and sell it at a loss. But how can it sell at a loss if it sells at FP, which is a cost-based rate, plus a markup which the utilities which use FP. The PF rate does not. If Bonneville sold all of its power at the PF rate, it would not cover all of its costs. Bonneville relies upon surplus sales to cover approximately 20 percent of its costs. My impression of reading the statute was that it sells to preference customers, public bodies, cooperatives, at the FP rate or PF rate, which is a cost-based rate. So it has to recover its costs. It does not, Your Honor. The way Bonneville makes rates is it takes its entire revenue requirement into account and then it allocates cost recovery to the different rate pools. The PF rate pool does not recover 100 percent of Bonneville's embedded costs. Bonneville relies because critical water usually does not occur, and Bonneville has surplus to sell into the market at market rates. Normally this is the case. Bonneville realizes revenues on those sales that exceed the unit cost that they would charge the PF customers. That margin is used to cover a portion of Bonneville's fixed costs. If we have critical water, Bonneville's expected surplus sales are going to fall short, and they may have a problem recovering their costs. They may have to dip into their reserves, or they may have to impose a rate surcharge on my client. But I guess the question is, at this point, has that happened as to the initial period? And you say you don't know. And will the second period ever start? And I take it you don't know that either. So it's hard for me to know how we're supposed to say the contract is or is not consistent with their statute or their statutory responsibilities. How do we go about doing that when there's nothing specific before us? There is, Your Honor. There is a contract and a rate. The rate is set somewhere else. It's taken as a given. The rate does not recover all of the costs of selling power to this customer. Well, we don't even know if they're going to go forward with their second period, right? Because they're waiting for a contingency. Unless they ñ I read their brief. They indicated that the contingency started, which would have triggered the transition period under their contract. Your Honor, they're asking you for an advisory opinion. They want you to loosen the standards established and, excuse me, loosen the statutory mandate that was applied by the PNGC 1 and 2 court and let them off the hook. They want to have the freedom. And if you look at the second period of this contract and the record of decision explaining it, they want the ability to continue to sell power to Alcoa for up to eight years below market prices. And if they lose money on those sales, they want to recover it in our rates. They say that they may incur losses of up to $300 million over the life of this contract. And they're perfectly happy. If they don't sell the power to Alcoa, since they can't store the power on a shelf. They will sell it into the market at a higher price. If there is a demand for it. And if there's not a demand for it, it will be a greater loss than $300 million. Is that not possible? Theoretically, it's possible. But, Your Honor, it's not realistic in this market. Does your case depend at all on your clients taking a different view of the forecast for power availability and demand? Your Honor, we think it was arbitrary and capricious for Bonneville to rely on average water instead of critical water forecasting for its determination that it had sufficient inventory of firm power to serve Alcoa without buying power in the market at high market prices and reselling it below those costs. So you disagree with the assumptions in their forecast, right? Yes. They assumed average water and they should not have assumed average water. Did that argument go to the initial period or to the initial period and the second period? It goes to the initial period specifically. We have every reason to believe that. Now, don't we know what happened in the initial period? I mean, how do we evaluate your argument that they used the wrong model when that period is over in a couple of weeks? Your Honor, the court's review is of Bonneville's decision at the time it made it. We don't know and they haven't told us. So they say the forecast model was reasonable and you say no, that you should have relied on the forward market, and so we would normally defer to their judgment as the agency. And we don't know at this point, right, or you don't know whether, in fact, their model was better or not, but the evidence would be existing. My client is active in the power markets. There's an affidavit of Greg Mendoza that appears here. It contains observed spot market prices. Every one of those observations exceeds the rate that Bonneville sells power to Alcoa. And, Your Honor, I don't want to tread on my colleague's time. I'm over time. Thank you. Thank you. May it please the Court, I'm Michael Dautin with Martin Law. I represent Alcoa that is a petitioner and an intervener in this case. The focus of this case, as Mr. Johnson told you, has been on the equivalence benefits test, and there are a few things that we agree upon in this case. And one that we do agree upon is that the court has before it the contract that EPA intended to enter into between Alcoa and Bonneville. That's a roughly seven-year contract over which EPA overlaid in response to its interpretation of this court's opinion in PNGC-2. Now, as I understand it, you're in part challenging your own contract, aren't you? We are, Your Honor, with EPA's permission, because EPA conceded in its record of decision that its interpretation of what was required in PNGC-2 would yield an unlawful result. I know. Isn't that somewhat collusive? Well, not collusive, Your Honor. You and, you know, BP enter into a contract and you both say, well, you know, we think we'll go to court to get this provision tested. Not collusive, Your Honor, because on this matter, we simply disagree with EPA's interpretation of PNGC-2, and we strenuously objected to their interpretation of PNGC-2 as they presented this equivalent benefits test. And Bonneville said, well, we think that the court is imposing upon us a standard that is that would render, or effectively render the 7C rate superfluous. But nonetheless, we think that the court is requiring this standard. Both ALCOA and BPA went to the panel in PNGC-2 and sought rehearing. And in response to that request for rehearing, the court amended its opinion and inserted a new paragraph that said, look, what we were asked to consider in PNGC-2 was a monetary benefits contract in which BPA gave money to the direct service industries to try and mitigate their market risk. In this contract, ALCOA is receiving firm power at the 7C rate. Firm power is expressly authorized in Section 5B of the Northwest Power Act. And if a sale is to be made, and the court in PNGC-2 expressly so held, then that sale must be made at the industrial power rate pursuant to statute. Bonneville's interpretation, we're frustrated being here, too, Your Honor. Believe me, we did not want to be here because we'd entered into a 7-year contract and it was all but signed. And then PNGC-2 came out and Bonneville said, gee, we think we've got to impose this equivalent benefits test. And, by the way, that moves your 7-year contract back to a 17-month contract. And the net result was the same. But then you had the option not to enter into the contract, right? I beg your pardon, Your Honor. Then you had the option not to enter into the contract. So are you really trying to appeal PNGC-2? Is that the idea? No, Your Honor. Had ALCOA not entered into the contract, it would have had to close the smelter. And, in fact, if this Court doesn't lift this equivalent benefits test overlay, then ALCOA will have to begin closing the smelter in approximately November 2011. When you say the overlay, you're referring to the overlay that BPA contends PNGC-2 imposed on it. Yes, Your Honor. They contended that in the contract. But that contract preceded the Court's amended opinion in PNGC-2. And so I think Bonneville's Respondent's Brief reveals that Bonneville believes that its conserved interpretation may have been actually more than the Court required in PNGC-2. And there are a couple of things, I think, that suggest that Bonneville was right in that respect. What does that mean? You two are on the same page now? We are not on the same page with respect to the application of the equivalent benefits test, Your Honor. And we are expressly asking this Court to remove the equivalent benefits test overlay and to find that the contract that you have before you for the sale of power at the industrial power rate is lawful. And we think that that's completely consistent with the Court's opinion in PNGC-2. And particularly, as the Court amended that opinion and added a significant paragraph in which it said, we would accord BPA rate discretion if it were making a physical sale of power at the industrial power rate and achieving. No, we might very well. We might very well, not we will, oh, we do. Yes, you're right to correct me, Your Honor. Because the Court didn't have before it this contract. But I think what they were trying to do was signal to BPA, BPA, you may have misinterpreted what we were trying to say in PNGC-1 and 2, where we had before us a contract that involved monetary benefits, didn't involve a physical sale of power. There was no express statutory authority for these monetary benefits. But what PNGC-2 did not do is to say what you've just said now, that the sale must be made at industrial power rate without any consideration of EBT. Or sound business principles. It did suggest that Monovil needed to adhere to a sound business principle standard, but if the Court looks at the amended opinion and the paragraph that appears, it's a paragraph that appears at 596 F2nd 1085. F3rd. F3rd. Pardon me. I'm dating myself, Your Honor. The paragraph that begins, although we cannot defer to BPA's voluntary decision to provide Alcoa with up to $32 million in cash payments, we note that the decision to sell physical power to Alcoa might produce a different result. And you're correct, Your Honor, they did say it might produce a different result because they didn't have a physical power contract before them and they appropriately declined to rule on that question. But your position is the physical power contract is to be priced at the IP rate without any consideration of equivalent benefits test. Is that correct? That's correct, Your Honor, because the Court expressly found in PNGC-2 that BPA may not apply a market-based test to the sale of power. That was precisely the issue that was before the Court under the monetary benefits contract. Monovil measured the monetary benefits that it paid to the industrial consumers based on a variable market-based standard. When BPA in its report in the ROD talks about a $300 million loss over the possible period of the contract, is that a loss figured from the market price to the income that they're going to get from the contract or from the IP price to the loss? Your Honor, it's a loss only in the sense that BPA makes a number of discretionary purchases for a number of purposes that get put into what I will call a pie that is Monovil's overall revenue requirement. How it divides up that pie is defined by Section 7 of the Northwest Power Act, Section 7b and 7c, 7b applying to the preference customers, 7c to the industrial customers. And so BPA incurs a loss if one looks at if Monovil has a choice to make a sale of Let me ask the question again. I'm sorry, Your Honor. You can answer it. Is loss figured as less than cost recapture or loss as the difference between what the money they get and the possibility of selling at the market? What is it? The $60 million is the amount of cost that BPA would incur to buy power in excess of the industrial power rate. So in order to make its commitment to you, if the second period were triggered, as I read BPA's brief in The Rod, there's at least a potential that they would incur a $300 million actual loss because they would have to buy power to realize their commitment. Is that correct? Yes, Your Honor, but I wouldn't characterize it as a loss. I would characterize it as a cost, the type of cost that Monovil regularly incurs, and the question is the recovery of that. How was Monovil to go about recovering the costs associated with all of its power sales? And this Court has previously addressed this question in the Golden Northwest case and before that in Central Lincoln People's Utility District, in which the exact situation was happening. Monovil was buying replacement Federal-based system resources and serving the DSIs with a portion of that. And again, public power entities objected. And this Court held that the preference customer's preference is to power, not to price. And they specifically sanctioned the sale of power to the direct service industries, even though the industrial power rate would not recover all of the costs associated with buying that Federal-based system power, replacement power. So are we into the second period? The prior counsel said no. But does BPA seem to take the position that PNGC-2 satisfied the first contingency for the second period? What is your position on that? Your Honor, the second period only begins if this Court issues an opinion that says that BPA need not apply the equivalent benefits test to a sale of power to the direct service industries. If that contingency is removed, then Monovil goes into the transition period where it has up to a year to make a purchase of the power. Okay. So if I understand you correctly, unless we would render a decision or some other Ninth Circuit panel specifically about the equivalent benefits test, the second period would never start running. Is that correct? The second period would not start running, and ALCO would have to start shutting down its smelter with the potential loss of 2,000 jobs beginning in November of 2011, Your Honor. Because the second phase of the initial period ends on May 26, 2012. And the smelter needs about six months to shut down. So that's why we urgently ask the Court to rule on the equivalent benefits test and to rule that BPA need not apply it. In the absence of that ruling, then you're correct, Your Honor, the transition period never begins and there is no power. Okay. So the language in BPA's brief stating that the amended PNGC2 opinion may reasonably be interpreted to mean that the EBT need not apply to sales under the ALCOA contract, in your view they were just kidding when they said that? No, Your Honor. I agree completely with them that the PNGC2 court in its amended opinion was attempting to make clear that the EBT would not apply to a physical sale of power at the industrial power rate. But that didn't trigger the second period, which says the Ninth Circuit holds that the equivalent benefits standard does not apply to sales under the ALCOA contract. That's the first of the three conditions. Pardon me, Your Honor. I'm sorry. I see your point. Yes, we would like Bonneville to have concluded that that triggered the transition period. They did not conclude that. They're looking for a clearer expression, I think, from this Court as to its ability to enter into the physical power sale. And I'm sorry, Your Honor, I have exhausted my time and a little bit of my opposing counsel's time. Thank you. Well, you still had a minute 40. Maybe you want to use that for rebuttal. All right. You reserve rebuttal for that. Okay. Okay. Go ahead. Good morning, Your Honors. May it please the Court, my name is David Adler, representing Respondent Bonneville Power Administration. I will be sharing my time this morning with Mr. Hub Adams, also representing Bonneville, and Mr. Jay Waldron, representing Bonneville's investor-owned utility customers. Mr. Adams will be addressing the NEPA issues before this Court, and Mr. Waldron will address some aspects of the equivalent benefits test, as well as the damage waiver provision of the contract. I intend to argue for 18 minutes, Mr. Adams for 7 minutes, and Mr. Waldron for 5 minutes. I would like to try to get to a little background context on this contract, Your Honor, starting out with just the initial period and the second period. Now, the Alcoa contract is divided into two periods. There is the initial and there is the second period. The initial period covers the first 17 months of the contract, and it has been extended for an additional year through May of 2012. The second period of the contract is strictly contingent, and that period covers the following five years after expiration of the initial period or the extended initial period in this case. Now, in the Alcoa record of decision, Bonneville demonstrated that its service to Alcoa during the initial period satisfies and promotes Bonneville's business interests because the benefits to Bonneville are forecast to equal or exceed Bonneville's costs. So that was only for the initial period as it was contemplated in the original contract, which was until May 26, 2011. That's correct. Is that correct? And so we're almost done with that period. Is that right? That's correct, Your Honor. But there is an extension now through May 12th. But that's not before us, correct? That's correct. That's not before the Court, and there are no petitions on that particular contract. So what we have is during the initial period Bonneville determined the benefits would equal or exceed the cost of Bonneville, the sales made on a take-or-pay basis, Bonneville receives a stable, predictable stream of revenue, and Bonneville receives valuable operating reserves as well as a host of other operational and intangible benefits. Is that part of the contract now moot because it's done, at least as contemplated in that contract? I mean, in a few weeks, it's not moot today? Well, I don't know that it would be moot, Your Honor, because we are ñ it is certainly coming to an end, that period of the contract. But I think there's the issue of whether or not Bonneville has properly applied the standards that this Court has articulated in PNGC-1 and PNGC-2, and it is part of this broader contract that's, in effect, a seven-year contract, although the second period is strictly contingent. Now, in contrast to the initial period where Bonneville made the determination that the ñ or basically, let me just step back a minute. In the initial period, Bonneville demonstrated that the benefits to BPA equal or exceed the cost and thereby satisfy what Bonneville has called the equivalent benefits test, or the EBT. And Bonneville developed it. If Bonneville charges the IP rate... Yes. ...which is the FP rate plus the markup... Correct. ...that covers the cost, doesn't it? Well, not necessarily, Your Honor, because Bonneville is recovering its cost through the PF rate, and then it is just charging an adder. The cost that I think the petitioners are alluding to is that Bonneville has to go into the market to purchase power and then sell this power back to Alcoa, essentially at a loss or at a lower cost. That is not what's happening in this contract. Bonneville forecast in the record, based on very reliable and very accurate data, that Bonneville does not need to go to the market to purchase power to serve Alcoa, but is serving it strictly from its inventory of power. Mr. Rutherford, the way I read the statute, even if BPA has to go out in the market and buy at market rates and sell to Alcoa at the IP rate, which is lower than market rates, and loses money, that's what the statute requires. That's correct, Your Honor. And on the record in this case, at times the IP rate, frankly, is above the market. At other times, the IP rate will be below the market. And it seems to me the market rate is irrelevant to the pricing of electricity under the statute to DSIs. It is the IP rate. That's correct, Your Honor. The IP rate is what Bonneville is instructed to charge under the statute when selling power to a DSI under Section 5D of the Northwest Power Act, which is exactly what Bonneville is doing in this particular case. And I wanted to touch for a minute on It seems, though, that at least in your analysis in the Rod, that there's an acknowledgment that there's at least a potential for a $300 million loss because of the difference in the possible price of buying power on the market. So can you explain that? Because it seems like you acknowledged that even in your brief. Yeah, I would like to explain that because what that $300 million refers to is really a cost cap. There are three conditions precedent that apply to service during the second period. One of those conditions is that service during that period would not exceed cost caps that were agreed to between Bonneville and Alcoa, and the cost cap is $300 million or essentially $60 million per year. So there is at this particular point So what does that mean? Is that a loss to BPA? In other words, you sell power to Alcoa at one price and because you have to purchase power on the market, it could be $60 million more than what you're getting back from Alcoa? Or does it mean something else? Essentially, that's correct. Essentially, that is what it means. What Bonneville was trying to do here was limit the extent of a loss. It wasn't going to be an open-ended contract that would say the market might bear as such in terms of having to acquire power. So Bonneville put a cap on that. What's significant, though, Your Honor, is that at this juncture, I think the Court doesn't really have the record of what those actual costs could be because Bonneville has not yet decided that it will provide service during the second period. So it's the first contingency. I'm confused, as you've probably heard me ask this question, because your brief states that you think PNGC-2 did satisfy the first contingency, and yet the second period has not started. What does BPA say? Did the PNGC-2 opinion, which you say in your brief, may reasonably be interpreted to mean that EBT need not apply to sales under the Alcoa contract? Did that satisfy the first contingency for the second period? What we're saying is this, Your Honor. PNGC-2 was issued, just from chronological perspective, there was PNGC-2, then Bonneville executed the contract, then PNGC-2 was amended. And so what happened is that the amendments from Bonneville's perspective clarified that the equivalent benefits test may be a little more strict and a little more rigid than it really needs to be. And so in deciding whether a decision to sell power to a DSI is consistent with sound business principles and whether Bonneville should enter into that contract, Bonneville believes there could be a more lax standard and Bonneville should have more latitude. So the contract says the second period is triggered if three conditions are met, and the first one is the Ninth Circuit holds that the equivalent benefits standard does not apply to sales under the Alcoa contract. Does PNGC-2 amendment meet that criteria or not in BPA's position? Frankly, we think it does, Your Honor. It does? Okay. So that is satisfied, that first contingency? We believe it does, but what we were hoping to do, Your Honor, was just get clarification that that is the case, because as I think can be seen from the various briefs and various arguments, there is really not agreement among the parties about that point at all. And so we were hoping just to get clarity that the Court has found that Bonneville can consider. For instance, the EBT looks primarily at dollars and costs alone in making this decision, whether a decision would be consistent with sound business principles. But in PNGC-2's amended opinion, especially the last paragraph, the Court talked about operational benefits to Bonneville or some intangible benefits to Bonneville, and these benefits are extremely significant for Bonneville's decision whether or not to enter into a contract. For instance, as we explained in our brief, the DSIs provide a very important element of helping Bonneville integrate wind generation into the power system. Mr. Adler, are you now agreeing with the – I think Mr. Johnson said that you or one of your colleagues said at one point, well, you think you overread the amendment to PNGC-2. Is that right? What we think is that the amendment to PNGC-2 clarified really that the standards that need to be applied to determine whether a decision is consistent with sound business principles can take other factors into consideration. And you also said now that the way you read that amendment now is maybe the EBT is too strict. That's correct. All right. So what is your test now? What's replaced the EBT? Well, I think what's appropriate, Your Honor, and I'd say this. We do believe it's too strict. We don't believe it's unlawful at all. We believe it's within the scope of Bonneville's discretion. No, but within your agency discretion, right? That's correct, Your Honor. What we think is the correct standard is actually similar to a position that was argued in the brief of the IOUs, and I think it's highlighted again in the opinion, and that is a reasoned business analysis. We think really what this Court was just coming down to in the PNGC-2 opinion is that Bonneville's decision whether to enter into a contract should have a reasoned business analysis, and in that analysis Bonneville would take into consideration tangible benefits, the actual dollars and the costs, intangible benefits, such as the fact that serving a DSI is a 24-7 load during light load hours, and that's a real benefit to Bonneville. Operational benefits such as the reserves Bonneville gets from the DSIs or all of those factors. If I could interrupt you. I'm just confused about what you want from us. I mean, the equivalent benefits test was BPA's invention. It was not something that the Court said, there is an equivalent benefits test that we read into the statute. So was that a reasonable determination for BPA? Should the Court uphold BPA's determination of EBT, or was that arbitrary and capricious? It was probably fine. Let's assume we would agree that it was fine. So now if you change it, it's BPA's determination whether they're going to use a different standard or not, consistent with their statutory responsibilities. I mean, we could evaluate a contract that was based on BPA's determination of how to apply PNGC-2, but I don't see why EBT, which is your invention, is before us other than to say, yes, it's within the framework of BPA's determinations. What we were hoping for, what we were concerned about, Your Honor, was that we would not get an opinion which would suggest that the EBT, while a lawful exercise of Bonneville's discretion, is the only exercise of its discretion. That is the only way Bonneville could go. What we wanted to do, we thought, based on the amendments to PNGC-2, which, again, was subsequent to the contract, that there was more latitude and we could adopt a more lenient standard that's more inclusive and takes more factors into consideration than just the EBT and takes a lot of these operational benefits, these intangible benefits. But then you entered into a contract that doesn't start until the Ninth Circuit issues an advisory opinion, basically, on your EBT. This just seems very odd. Well, yeah. How is that even before us? You know, if it's the decision as to whether the BPA can enter into a contract that's contingent, which is how opposing counsel frames it, that's one issue. Right. But if it's a question as to Ninth Circuit, will you issue an opinion on EBT so that we can then go forward with our contract, I just don't understand how that is properly before us. Well, because the contract is based on providing this second period service based on these conditions precedent being satisfied. Well, one of them is us, right? One of them is a Ninth Circuit ruling that, in your view, hasn't occurred yet. That's correct. That hasn't occurred yet because we perceived it would be necessary to get clarity. I mean, I'll be quite frank, Your Honor. Bonneville went into this contract basically with two strikes against it. We had PNGC-1 and PNGC-2, and the court said, no, this doesn't work in this contract. We were being very cautious. We were being very conservative in how we were interpreting PNGC-2 so that we would not be running afoul again of what the court might interpret. So with the second period service, we wanted to make sure we would not agree to provide service to Alcoa for an extended period of time just to have it looked at questionably by the court and have the court come back and say, well, this might not work. So we were hoping to get the additional clarity about the appropriate standard that we could apply going forward, especially given the fact that any issue of signing a contract with the DSI has become extremely divisive, litigious, and acrimonious, and we're hoping that that would help us in the future minimize some of that acrimony and litigation. Well, you realize that all we can do is to say what you've done is good or not good. We can't give you an advisory opinion of what you should do tomorrow. And when you talk about equivalent business benefits test, it sounds to me like you're saying that you'd like to apply sound business principles to allow the consideration of long-term intangible factors to justify a possible loss on the sale of power to Alcoa. And there are other sound business principles, such as maximizing profit. You want to be able to choose between sound business principles, some long-term consideration of intangible effects, but not the bottom line in any particular year as to whether you're making money. Can you reconcile your picking and choosing among sound business principles? Yeah, well, the problem here that I think you've accurately categorized and captured here is that Bonneville is not a for-profit business. Bonneville is a federal agency, first and foremost, and as a federal agency, nothing in its statutes directs Bonneville to make a profit from a sale of power to a DSI, but it does direct Bonneville to provide public benefits. Those public benefits also include, for instance, providing an adequate economic efficient power supply. There's a hierarchy of considerations that apply to Bonneville. Number one is providing low-cost power in the greatest possible area to consumers and to rural interest. And then the tagline of that same sentence is business principles. Business principles is not to override the beginning. Well, that's correct. And even when looking at the statutory language itself in the Northwest Power Act and the Transmission Systems Act, it's couched in terms of cost recovery. It's Bonneville shall establish rates at the lowest possible rates, consistent with sound business principles to recover Bonneville's costs. It's not a matter of making a profit, and so that's why we've been, frankly, wrestling with the application of this standard to Bonneville's contracting decisions. When I look through your reasoning, though, for the $300 million, let's assume that there's a $300 million loss, which is at least a potential, because it is described as such in the record of decision, and all of the reasons that were set out did not seem particularly persuasive or strong. What is the most important intangible benefit that would counter that sort of loss that would raise your preference customers' rates by 4 percent? Well, I think there are numerous, numerous operational benefits and intangible benefits. Again, I would say integrating wind generation is enormously important to Bonneville. We have 3,000 megawatts of wind on the system, more than any other utility in the country. And so how does entering into this contract with this $300 million potential loss help you integrate wind generation? Because wind is notoriously volatile, unpredictable, and unstable, and a power system thrives on stability and balance. There has to be a balance between loads and resources. Okay, you're throwing a lot of words, but when I was reading your brief, it seemed to say that there's a benefit to not having to shut down. So for wind power, sometimes you'll keep operating because there's a cost to shutting down and starting up again. But that would assume that you would want to shut down, that there wouldn't be a surplus on the market. But isn't the whole premise that you have to go out and buy it, so there really wouldn't be this cost of continued operation? But there are many times when you have over-generation problems as well. And part of it is because this is a hydro system. It's not like we just have nuclear power and running the whole system. What we have is a system that does depend on variable water conditions. So you might have a lot of water in the river, and you might have a lot of wind blowing, and you've got all of this generation, and you need a market for it. Well, the DSIs, especially a load like Alcoa, provides a 24-7 stable, predictable load where we could deliver that power. And that helps us considerably. I'm sorry, Your Honor. I'm sorry. I'm just not understanding specifically how the fact that Alcoa would buy your over-generation of wind power provides a significant economic benefit or even non-economic benefit. What is that benefit specifically? The benefits don't need to just be economic. For instance, Bonneville is statutorily obligated to promote the development of renewable resources. Integrating wind into the system is a primary way of doing that. And why can't you do that without the contract? Well, this helps us. It helps us address and mitigate some of the problems that are pertinent to the generation of wind power and integrating it into the hydro system. And we did try and explain this in our brief to some degree and in the record, but Bonneville's opinion is that this is increasingly important. There's also the reserves we get from Alcoa. When Bonneville enters into a contract, Bonneville has the right right now on 10 minutes' notice to interrupt service to Alcoa for up to an hour, I'm sorry, 105 minutes per episode. And we can do that more than even once a day if we need to. So if there's an emergency, if there's needs, we can tap into that immediately on 10 minutes' notice and get that power. That's very valuable to Bonneville. It's valuable to Bonneville that this is a stable, predictable load, and we don't have to depend on market rate volatility, which would be the alternative. Go to the market and sell power into the market at whatever the market rate happens to be. It could be sky high. It could be way above the IP rate sometimes. And so this gives us a stable, predictable stream of revenue. That's very valuable. The fact that Bonneville can rely on this on light load hours when it's evenings, weekends, summer in the Pacific Northwest and get that stream of revenue, all of that is an important benefit, and those are the kind of benefits we think we should be taking into consideration. I'm sorry, Your Honor. Thank you all. Mr. Adams now to address some of the legal issues. May it please the Court, my name is Hub Adams. We're responding to Bonneville Power Administration. I think you can tell from the last 45 minutes of these arguments, 50 minutes, 55 minutes, that this case is really about money and the distribution of costs, not about a concern for the environment or for NEPA. Nonetheless, I'll try to briefly touch on the NEPA issues that have been raised by petitioners, PPC, K&B, and NRU in their briefs. And these really boil down to just two questions. Do they have standing? And is our decision to enter into contract to serve an existing facility with no change in the current state of the environment something that violated NEPA? The answer to both those questions is no. On standing, I'll only, again, touch on this briefly since we have extensively briefed this issue. But, of course, the petitioners bear the burden of establishing their standing and establishing that they have a personal stake in this interest. Nowhere in their briefs did they do this in a concrete manner that's sufficient to establish Article III or prudential standing. In fact, when they were questioned on their standing, it really came down to one attempt through a declaration of the executive director of PPC, Mr. Scott Corwin, and even that was deficient. They failed to show concrete injury. They failed to show geographic nexus to the area. Didn't they show some injury? Weren't they talking about transmission congestion? So there was some injury that they identified for Article III purposes, right? Well, yes, Your Honor. In fact, in their reply brief at page 20, they really finally, after all the writing, got down to what I believe are their two injuries that they claim. One is that there's a claim NEPA procedural violation, and the other is this transmission congestion issue. On the NEPA procedural violation, I think that clearly turns, by trying to use procedural violation as a concrete injury, that turns Summers v. Earth Island Institute on its head in the sense that clearly in Summers, they said that the Supreme Court said that you needed to have a concrete interest underlying any procedural claim. On the transmission congestion claim, as far as injury goes, it's a little unclear how that really translates to an injury, first of all, for Article III purposes. Secondly, I think it's very clear that that type of injury is speculative and highly attenuated. In the administrator's rod that was prepared at the time of the decision, and it's in the SER 117 to 118, there's a discussion of that precise issue that was raised at the time of comments on our action. And it was explained that the transmission congestion situation in the Puget Sound area, which is what we're talking about here, is really a whole bunch of different factors. It's a preexisting condition, and it's not clearly attributable, A, to this action at all, and, B, even if Alcoa service went away, Alcoa continues to hold transmission rights in the area, so they could sell that transmission capacity, and this could have no effect whatsoever on that transmission congestion issue. So I think there's also a serious causation issue when they try to rely solely on a transmission congestion basis for proving concrete injury. Moving to the merits, I think, again, our brief is fairly clear on the situation here and that this case is indeed without merit. The brief explains what we articulated at the time of our decision, that is how BPA's review of the contract under NEPA, an application of one of its categorical exclusions to this contract, one that involved merely continuing to provide service to an already existing unchanged facility, did not violate NEPA. In Metropolitan Medicine v. People Against Nuclear Energy, the Supreme Court made clear that the key inquiry in NEPA cases is whether the challenged federal action is proximately related to a change in the environment. This court in Burbank Anti-Noise Group v. Goldschmidt linked NEPA requirements to a significant degradation or deterioration, that is a change in conditions for the worse, of some environmental factor. It might be a good idea to let your last man get up and have something to say. Thank you, Your Honor. Should I – have I covered this sufficiently? Thank you. Especially when you start reading from the brief. All right. Thank you, Your Honor. Good morning. May it please the Court, I'm Jay Waldron, appearing on behalf of the private utility intervenors. This Court has repeatedly admonished BPA that it must appear and operate consistent with sound business principles. The damages waiver in the ALCOA contract is consistent with sound business principles. And first, I'm going to briefly address the damages waiver in the ALCOA contract because the public petitioners here have claimed it is unlawful. The damages waiver is an important contract tool for BPA. The damages waiver is simply a mutual limitation on remedies. It is a mutual waiver of the right to seek restitution against each other if a contract is overturned. There is no question that if these were two private businesses, that the damage waiver would be lawful. Businesses commonly use these types of waiver to allocate risk, especially in complex agreements that are difficult to unwind. In my own legal career, in environmental matters, in brownfields matters, I've often used these type of clauses. And there are strong business reasons for BPA to use the damages waiver. As you well know, BPA is both a federal agency and a major power supplier. And because it's a federal agency, third parties can challenge all BPA power contracts. And as this Court knows all too well, routinely every BPA power contract just about is challenged. BPA customers like ALCOA, like my own clients, make financial and operating commitments and reliance on these power contracts. And the damages waiver protects BPA from people like ALCOA or us seeking damages if BPA misjudges its contracting authority. The damages waiver gives some certainty to financial consequences by providing that they're not going to be unwound. In the absence of a damages waiver, anyone entering into a contract, and ALCOA is an example, has got to wait one, two, three, four years because the contract is likely to be challenged and you're going to have to understand the nice circumstances. Let me ask you a question. You're sitting on that side of the table. You're representing independent investor-owned utilities? Yes, Your Honor. If this contract goes through and they run a $300 million loss, won't that result in your rates going up? It could, Your Honor. Is that a favorable result as far as your clients are concerned? Well, I think what our client is concerned with in the equivalent benefits test, besides the complicated process as to what type of an opinion this would be, our concern is that BPA be able to operate under sound business principles and that the equivalent benefits test be expanded or be substituted with another name by this court which would allow BPA to look at short-term, as Your Honor discussed from economics, short-term and long-term, that BPA be able to look at operating benefits for not just the ALCOA contract, but any contract, that they be able to look at sound business principles. And that is also a concern, and we support BPA in that. And just to make one final point on the damages waiver, the damages waiver is consistent with contract law. If you look at our brief in the restatement second of contracts, the usual remedy for contract invalidity is to refuse to enforce the contract at the time of the invalidity, not to go back before the contract was entered into and restore the parties. It's not an exercise in humpty-dumpty, Your Honor. It's an exercise in humpty-dumpty we feel is a sure recipe for continuing litigation. The damages waiver is consistent with BPA's governing statutes. There is no legal impediment. The cases cited by Petitioner all stand for the right of the government to recover money, but they do not stand for the duty to recover money. And I don't believe there is any merit to their constitutional claim. BPA doesn't operate under the Appropriations Clause, and neither this Court nor the United States Supreme Court forbids the government from waiving claims. Your time has expired. Thank you very much, Your Honor. A minute and 40 seconds.  Good morning. May it please the Court. My name is Melinda Davis, and I'm appearing today on behalf of the Industrial Customers of Northwest Utilities. Sound business principles stands for the concept that Bonneville may not give money away, and that applies to whether we're talking about a physical power sale or a monetary benefit, as we saw in PNGC 1 and 2. What I'd like to bring to the Court's attention is that Bonneville justified this discretionary sale to Alcoa. In the first instance, Bonneville has to decide, are we going to sell power to Alcoa? Are we going to sell it to the market? Are we going to do something else with this power? What Bonneville did is they created the equivalent benefits test to measure and decide whether or not to sell this power to Alcoa. BPA says PNGC 1, PNGC 2 stand for the proposition that we can't lose money. BPA agrees with that. So BPA went through this exercise of what they call the equivalent benefits test to decide whether or not they lost money on this deal. The fact is is that they do lose money on this deal. If I would point you to the administrative record, page 6. I would say they can't lose money. I mean, you still maintain that in light of the amendment to PNGC 2? Yes, Your Honor. I have two responses to that. One is I don't think that that amended opinion had anything to do with changing the Court's fundamental reasoning, which is BPA cannot enter into a discretionary sale that loses money. And the second thing is I believe that this language that has been so relied upon by BPA and by Alcoa is dictum. It is the Court's response to a hypothetical situation. It's not central to their ruling. Those facts were not before that Court. Well, you know that the law of the Ninth Circuit is that well-considered dictum is the law of the Ninth Circuit. Do you consider this not well-considered? No, Your Honor. It was based on a hypothetical situation. If you look at the context upon which the Court made that statement, it was relying on an argument that a DSI had made with regard to whether BPA would ever enter into these kinds of situations. And the Court, in response to that DSI, said here are some circumstances that would shift the other way, possibly hypothetically, in your favor. And they said this is not, these are examples. This is not an exhaustive list. They were not ruling on that issue. Would you kindly conclude? Yes, Your Honor. The last point I would just simply make is that if you take a look at the numbers that Bonneville relied upon to justify this decision under the equivalent benefits test, which is the test that is in the record of decision here, there is this demand shift argument. And I'd just like to point out to you that that argument does not make any sense. If you do not accept that argument, then Bonneville, using its own numbers, will lose $6.3 million, not hypothetically, but actually based on their analysis. Thank you very much. Thank you. Thank you very much. All right. The case of Alcoa v. Bonneville will stand submitted, and the Court will stand in recess for 10 minutes.
judges: Tashima, Bea, Ikuta